**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| NATHAN MCCANN, | : : | |
| Plaintiff, | : : | Civil No. 18-13909 (RBK/KMW) |
| v. | : : | **OPINION** |
| THE PNC FINANCIAL SERVICES GROUP, INC., *et. al.*, | : : : | |
| Defendants. | : : : : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon the Motion (Doc. 22) of Defendant PNC Financial Services Group ("PNC Bank" or "Defendant") for Summary Judgment. For the reasons expressed herein, Defendant's Motion (Doc. 22) is GRANTED.

**I.   BACKGROUND**

**A.   Factual History**

This employment discrimination case arises from Plaintiff Nathan McCann's employment with and termination from Defendant PNC Bank. Plaintiff is an African-American man and was born in 1973. (Doc. 22-4 ("Def. SOF") ¶2.) In September 1995, Plaintiff began working at Midlantic Bank in Cherry Hill, New Jersey. (*Id.* ¶7.) Plaintiff became a PNC Bank employee in September 1996, when it acquired Midlantic Bank. (*Id.* ¶8.) Plaintiff advanced through a number of roles at PNC over the years. He began his career as a Customer Service Representative, became a Licensed Financial Sales Consultant in September 1999, and became a Business Banker in 2000. (*Id.* ¶¶7–10.) As a Business Banker, Plaintiff managed clients whose total annual revenue ranged

1

between $1 million and $10 million. (*Id.* ¶13.) Plaintiff worked as a Business Banker until 2014, when he was offered a position as a Senior Government Banker. (*Id.* ¶11.) Plaintiff states that he accepted the government banking position because he wanted to continue learning, and wanted to become more versatile in his career. (Doc. 22-14 at 24.)

In April 2016, PNC began eliminating its Senior Government Banking positions in the Philadelphia and Southern New Jersey region. (Def. SOF ¶12.) Rather than being terminated, Plaintiff was offered the chance to return to Business Banking. (Doc. 22-14 at 27.) Plaintiff returned to Business Banking, where he remained for only a few months: in June 2016, due to PNC's reorganization of its Business and Commercial Banking Groups, Plaintiff and two other senior Business Bankers—Justin Cunnane and Harris Friedberg—transitioned to the Commercial Banking Group. (Def. SOF ¶16.) Prior to the reorganization, Business Banking handled clients with total annual revenue between $1 million and $10 million, and Commercial Banking handled clients with total annual revenue between $10 million to $50 million. (*Id.* ¶13.) After reorganizing, Business Banking handled clients with total annual revenue between $1 million and $5 million, and Commercial Banking handled clients with total annual revenue between $5 million and $50 million. (*Id.* ¶15.)

Thus, when Plaintiff joined the Commercial Banking group as a Relationship Manager ("RM"), Defendant alleges that he brought with him from Business Banking his existing clients—approximately 30—with total annual revenue above $5 million. (Doc. 22-14 at 99; Def. SOF ¶27.) Plaintiff, however, alleges that he essentially had to "start from scratch" when he began, and did not maintain those clients. (Doc. 27-2 ("Pl. RSOF") ¶¶24–27.) Aside from his preexisting clients, Plaintiff was also given books of business from other bankers. (Def. SOF ¶26.)

Plaintiff's job duties in his role as Commercial Banking RM were to manage his client base, develop new business, and meet specified annual sales goals. (Def. SOF ¶¶18–21.) This required making telephone and in-person calls to existing and potential customers, in part based on business that Plaintiff discovered himself, and in part based on "leads" Plaintiff received from his supervisor and his assigned client solutions specialist. (*Id.*) The role also required developing "Centers of Influence" (COIs), which are relationships with influential people in the community who could refer new business to the RM. (*Id.*)

Plaintiff's direct supervisor was Donald Paterson, the Group Manager for Commercial Banking. (Def. SOF ¶16.) Paterson in turn reported to his manager, Salvatore Patti, who was replaced by Michael Willets in August 2017. (*Id.* ¶¶31–32.) Plaintiff's client solutions specialist was Hasani Walden. (Doc. 27-7 at 2.)

At the end of 2016, Plaintiff received a year-end performance summary from Paterson; he received an overall rating of "Meets Some Expectations." (Def. SOF ¶34.) Paterson praised Plaintiff for his relationships with his clients and understanding of PNC Corporate Risk policies, and stated that he "has all the skills to be successful in Commercial Banking." (Doc. 22-5 at 15–23.) However, Paterson noted that, given all the transition Plaintiff experienced at work in 2016, he would need to take time to develop a viable prospect list and to develop COIs. (*Id.* at 34.) This performance summary still technically addressed Plaintiff's performance in Business Banking, as he did not officially join Commercial Banking until January 2017. (Def. SOF ¶29.)

Paterson constructed a 2017 individual goal sheet for Plaintiff and the other Commercial Bankers. (Def. SOF ¶37.) The total revenue target for 2017 was $375,000; this target was the lowest number used for Commercial Bankers, and was used for all of the bankers who had transferred from Business to Commercial Banking. (*Id.* ¶¶37–39.)

3

As 2017 progressed, Plaintiff did not meet the targets set out in his goal sheet. In March 2017, one of Plaintiff's senior managers notified Human Resources and Employee Relations that Plaintiff was not successfully transitioning from Business to Commercial Banking. (Def. SOF ¶40.) Consequently, on April 3, 2017, Plaintiff received a Performance Expectation Plan ("PEP") from Paterson that set goals for Plaintiff, including: a goal of developing COIs to provide more referrals in the $5 million to $50 million sales range, a goal of 10 in-person calls a month, and a goal of getting on track to meet year-end goals by June 30, 2017. (*Id.* ¶43.) Plaintiff also began receiving weekly coaching to help him meet his revenue goals. (Doc. 22-7.)

In June, as Plaintiff was still not on track to meet his goals, Salvatore Patti contacted Tiana Escofil, an Employee Relations Specialist, to inquire about the process of giving Plaintiff a verbal warning. (Def. SOF ¶49.) After Escofil approved the verbal warning, it was issued to Plaintiff on July 18, 2017. (*Id.* ¶50.) On July 24, 2017, Paterson contacted Escofil to discuss Plaintiff's proposed 2017 mid-year performance rating. (*Id.* ¶52.) After their discussion, Paterson issued a "Meets Some Expectations" rating to Plaintiff. Paterson noted that, while there were some areas in which Plaintiff did very well, such as rapport with clients, he had only achieved $45,000 in revenue versus the mid-year goal of $187,500. (*Id.* ¶¶53–55.)

On September 21, 2017, Paterson and Michael Willets met with Escofil to inquire about issuing a written warning to Plaintiff, as he had generated $55,523 in revenue versus a goal-to-date of $281,000 and a year-end goal of $375,000, and he had zero new client relationships versus a goal of two. (Def. SOF ¶¶56–59.) After Paterson's draft written warning was approved by Escofil, it was issued to Plaintiff on September 28, 2017. (*Id.*) On November 14, 2017, Paterson again contacted Escofil, this time to discuss the process for putting Plaintiff on probation, as

4

Plaintiff had produced the least revenue of any RM and remained significantly under his goals. (*Id.* ¶¶67-68.)

In early 2018, Paterson gave Plaintiff a "Meets Some Expectations" rating on his 2017 Year-End Performance Summary. (Def. SOF ¶71.) Against his annual goal of $375,000, Plaintiff generated $98,401 in revenue for the year; he also failed to obtain any new clients, and made 260 calls out of the expected 312 calls for the year. (*Id.* ¶¶71–74.) In January 2018, Paterson and Escofil met with Plaintiff to inform him that he was being placed on probation, and to discuss steps Plaintiff needed to take to improve performance. (*Id.* ¶78; Pl. SOF ¶20.) On February 15, 2018, Paterson and Willets met with Escofil to discuss Plaintiff's performance; at that point, they determined that Plaintiff would be terminated. (Def. SOF ¶¶81–82.)

On February 27, 2018, Paterson and Escofil met with Plaintiff to inform him that he was being terminated for performance reasons. (Def. SOF ¶82.) Plaintiff did not receive any severance payment upon termination; Defendant states that Plaintiff was ineligible for severance "because his employment was terminated involuntarily for poor job performance." (*Id.* ¶93.) Plaintiff was 54 years old at the time of his termination, and was the oldest RM in his assigned region of Philadelphia/Southern New Jersey. He was also the only African-American RM in the region. (Doc. 27-6 at 18–19.) Plaintiff's position was later filled by a younger, white employee. (Pl. SOF ¶27.)

### B. Procedural History

On August 10, 2018, Plaintiff filed suit against PNC and unnamed PNC employees in the Superior Court of New Jersey (collectively "Defendants"). (Doc. 1-1.) His Complaint, which alleges that he was set up to fail in his role in Commercial Banking due to his race and age, brings several claims for violations of the New Jersey Law Against Discrimination ("NJLAD"):

discrimination and wrongful termination on the basis of race (Count One), and discrimination and wrongful termination on the basis of age (Count Two).

On September 14, 2018, Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1332 and 1441(b).[1] (Doc. 1 at 4.) On February 21, 2020, Defendant filed a motion for summary judgment, which the Court addresses now. (Doc. 22.)

## II. LEGAL STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in his favor. *Id*. at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must

---

[1] Plaintiff is a citizen of New Jersey, Defendant PNC Financial Services Group is incorporated in Pennsylvania and has its principal place of business in Pennsylvania, and PNC Bank—the entity that Defendant alleges actually employed Plaintiff, and is the proper Defendant in this suit—has its principal place of business in Delaware. (Doc. 1 at 4.)

6

at least present probative evidence from which a jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III.    DISCUSSION

As the New Jersey Supreme Court has long recognized, "New Jersey has a strong interest in maintaining 'discrimination-free workplace[s]' for workers." *Cutler v. Dorn*, 955 A.2d 917, 923 (N.J. 2008) (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 452 (N.J. 1993)). Accordingly, the NJLAD makes it unlawful

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex . . . of any individual, . . . to refuse to hire or employ or to bar or to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

*Lehmann*, 626 A.2d at 452 (citing N.J. Stat. Ann. § 10:5–12(a)).

Discrimination claims brought under the NJLAD are analyzed under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tourtellote v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) ("This Court's discrimination inquiry is the same for claims filed under Title VII and the NJLAD[,] as the New Jersey statute borrows the federal standard set forth in *McDonnell Douglas*"). Under this framework, the burden initially lies with the plaintiff, who must establish a prima facie case of discrimination. *Tourtellotte*, 636 F. App'x. at 848. After the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id*. at 842. Finally, if the defendant is able to articulate a nondiscriminatory reason, the burden shifts back to the plaintiff to show "that the legitimate reasons offered by the

7

defendant were not its true reasons, but were a pretext for discrimination." *Terry v. Borough*, 660 F. App'x. 160, 163 (3d Cir. 2016).

Here, Plaintiff alleges several theories of discrimination in violation of the NJLAD: wrongful termination based on race and age, failure to promote based on race and age, and disparate treatment based on race and age. The Court addresses each theory in turn.

### A. Wrongful Termination

To establish a prima facie case for wrongful termination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was terminated from the position; and (4) the action occurred under circumstances that could give rise to an inference of discrimination. *Tourtellotte v. Eli Lilly and Co.*, 636 F. App'x 831, 842 (3d Cir. 2016); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999). If the plaintiff can successfully establish a prima facie case of wrongful termination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for terminating the plaintiff. *Id*.

Plaintiff alleges that Defendant violated the NJLAD by wrongfully terminating him due to his age, as he was 54 years old at the time of termination, and due to his race, as he was the only African-American RM in his region. He alleges that, because of these protected characteristics, Defendants viewed him as "not a good fit for PNC's commercial banking image." (Doc. 27 ("Pl. Resp.") at 6.)

Rather than addressing whether Plaintiff could make a prima facie case for wrongful termination based on age or race, Defendants argue that summary judgment is warranted because Plaintiff is unable to rebut Defendants' legitimate, nondiscriminatory reason for termination. (Doc. 22 ("Def. Mot.") at 32–33.) Defendants allege that Plaintiff was terminated not because of his age

8

or race, but because he simply failed to meet PNC's performance expectations for the Commercial Banker position throughout the 2017–2018 year. (*Id.*)

As factual support, Defendants note that, in 2017, Plaintiff produced only $98,000 in revenue against a goal of $375,000. (Def. Mot. at 33.) This goal of $375,000 applied to all bankers who, like Plaintiff, transitioned from Business to Commercial Banking that year; however, Plaintiff was the only banker who did not meet this goal. (*Id.*) Further, Plaintiff did not meet the goal of bringing in two new clients, and did not meet his calling goals. Defendants note that, from March 2017 to January 2018, Plaintiff's supervisors regularly met with him to discuss areas where he fell behind in performance, and offered plans for improvement. Plaintiff's supervisors had issued a PEP in April 2017, a verbal warning in July 2017, and a written warning in September 2017, and placed him on probation in November 2017. Yet, after each of these meetings and warnings, Plaintiff's numbers had not improved. Defendants allege that, by early 2018, it was clear that Plaintiff was not doing well in Commercial Banking, and they accordingly terminated him. Defendants argue that Plaintiff has proffered no evidence that would allow a jury to find that race or age factored into this termination or the preceding disciplinary actions, or that any comparable employee outside Plaintiff's protected classes avoided termination despite similarly poor performance. (Def. Mot. at 37.)

In attempting to rebut Defendants' nondiscriminatory reason, Plaintiff argues that he was "set up to fail" by Defendants. (Pl. Resp. at 18.) In support of this theory, he alleges that, during reorganization, PNC forced him into a Commercial Banking role which he had no experience in, rather than offering him a severance package. Once in the Commercial Banking RM role, he alleges that Paterson gave him "bad" leads, causing him to produce less revenue than other RMs and fail to meet his annual goals. (Pl. Resp. at 8.) He further alleges that, when he asked for help

9

with improving, he was ignored, thus leading to his failure in the new role and subsequent termination. (*Id*.)

While Plaintiff spends much of his brief painting a picture of how Defendants failed to support him in his role as RM, he offers very little to suggest that this was due to his age or race.

### *Age-based Wrongful Termination*

Plaintiff offers two pieces of evidence to support his claim that he was terminated based on his age: he cites to the fact that he was replaced by a younger employee, and he cites to his deposition testimony, in which he stated, "it was talked about that PNC wanted a younger workforce . . . I saw documents or e-mails that was talked about that the workforce of PNC was aging." (Pl. Resp. at 16–18.)

Plaintiff does not provide any of the "documents or e-mails" he referenced in his deposition, nor does he expand any further on their contents. Yet, he argues that summary judgment may not be granted because an issue of fact exists regarding the question of why PNC was "fostering an environment where employees felt the bank wanted a younger workforce." (Pl. Resp. at 6.) Plaintiff does not point to anything in the record showing that any employee besides himself felt this way. Summary judgment cannot be defeated by a vague reference to evidence that is not included in the record, nor by alleging a nonexistent issue of fact. *See Parker v. Sch. Dist. of Philadelphia*, 415 F. Supp. 3d 544, 552 (E.D. Pa. 2019), *aff'd*, Civ. No. 19-3940, 2020 WL 4530107 (3d Cir. Aug. 6, 2020) (noting that "the party adverse to summary judgment cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions" (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). While Plaintiff may have felt that PNC wanted a younger workforce, his conclusions and "mere suspicions" are insufficient to rebut Defendants' nondiscriminatory reason for termination. *Id*. at 554.

Further, the fact that Plaintiff was replaced by a younger employee, standing alone, is insufficient to show pretext. *Mirabella v. Oasis Foods Co.*, Civ. No. 12-6218, 2014 WL 7272955 (D.N.J. Dec. 16, 2014). Summary judgment is thus warranted on Plaintiff's age-based wrongful termination claim. *See Bentley v. Millennium Healthcare Centers II, LLC*, Civ. No. 06-5939, 2009 WL 211653, at *8 (D.N.J. Jan. 21, 2009), *aff'd*, 363 F. App'x 891 (3d Cir. 2010) (granting summary judgment on an NJLAD age discrimination claim where the Court found that "[t]here is not a hint . . . in any testimony cited by Plaintiffs that age had anything to do with the" adverse employment decision).

### *Race-based Wrongful Termination*

The Court turns next to Plaintiff's race-based wrongful termination claim. In support of his argument that his termination was improperly based on his race, Plaintiff alleges that he was the only African-American RM in his region, that Paterson provided Plaintiff's white coworkers with better leads, and that another PNC employee, Phyllis Moses, indicated that the company was discriminating against Black men.

Plaintiff's contention that Paterson purposefully provided Plaintiff with bad leads is unsupported by the record. Although Plaintiff's brief very selectively cites to the record, it is clear that the RMs in Plaintiff's group were all given mixed quality leads, but that, unlike the other RMs, Plaintiff failed to "scrub" his list to remove the bad leads.[2] Scrubbing worked as follows: Paterson would instruct Walden, the support specialist, to distribute leads to RMs, who would then follow up on them and determine their quality. (Doc. 27-7 at 9.) If an RM determined that a lead was poor quality—whether because the potential customer was not interested in PNC, or because their

---

[2] Plaintiff's brief cherry-picks single lines of deposition testimony from the record, and takes them out of context. For example, Plaintiff's brief states that Walden agreed with Plaintiff that he received "poor quality leads." (Pl. Resp. at 8.) However, this ignores the context: Walden actually stated that *every* RM received some poor quality leads, and went on to state that all RMs but Plaintiff would then scrub the poor leads from their lists. (Doc. 27-7 at 8–12.)

11

revenue was too low for Commercial Banking—the RM would "scrub" the list by asking Walden to remove the particular lead from their list. For every lead that was removed, Walden would add another lead to the RM's list in order to keep it at a certain number of leads. (Doc. 30-3 at 40.) Thus, by "scrubbing" the list of bad leads, an RM could potentially obtain a number of new, good leads. (*Id.*)

Walden testified in her deposition that, except for Plaintiff, all of the RMs she worked with, including the other two RMs who transferred from Business Banking, would scrub their lists of poor quality leads. (Doc. 30-3 at 37–38.) Walden had suggested to Plaintiff that he scrub his list as well; however, she stated that Plaintiff would not do so, and thus the bad leads remained on his list. (*Id.*)

Plaintiff does not dispute that he did not scrub his list, nor does he offer any reason why he would not do so—he maintains that he was simply given bad leads to begin with, and that it was based on his race. (Doc. 27-6 at 20.) However, Plaintiff offers no evidence to support his argument that Paterson assigned leads based on race, and offers no evidence to show why he did not simply scrub these bad leads as the other RMs did. As with his age-based claim, Plaintiff's mere suspicion that he was assigned bad leads based on his race is insufficient to show pretext or to defeat summary judgment.[3] *See Parker v. Sch. Dist. of Philadelphia*, Civ. No. 19-3940, 2020 WL 4530107, at *3 (3d Cir. Aug. 6, 2020) ("In response to a summary judgment motion, a litigant cannot rely on suspicions, simple assertions, or conclusory allegations.")

---

[3] The Court also notes that, because Plaintiff's claim is based on his theory that he was "set up to fail," his refusal to scrub his leads is particularly significant. Plaintiff cannot show "deliberate sabotage of [his] performance, such as simply assigning [tasks] that are impossible to accomplish," where he did not take the recommended steps to accomplish the required tasks. *Cardenas v. Massey*, 269 F.3d 251, 262 n.8 (3d Cir. 2001) (finding plaintiff was set up to fail when he was given contradictory instructions and berated when he failed to comply).

Aside from his argument regarding leads, Plaintiff offers as evidence phone conversations he had with Phyllis Moses, an African-American woman employed by PNC as an underwriting manager. (Pl. Br. at 9.) Plaintiff alleges that, six to eight months before his termination, Moses told him that she "would like to see [Plaintiff] succeed because PNC does not like to see Black men in commercial banking roles."[4] (Pl. Br. at 9.) Moses stated in her deposition she does not recall ever making such a statement and that she does not agree with the statement as quoted by Plaintiff. (Doc. 27-7 at 16–21.) While the parties dispute the content of the conversation between Plaintiff and Moses, this does not present a factual issue sufficient to defeat summary judgment. Viewing the record in the light most favorable to Plaintiff, even if the conversation did occur exactly as he reports, it is nonetheless insufficient to rebut Defendant's nondiscriminatory reason for termination.

Moses was not in a position where she had insight into the decision to terminate Plaintiff, and there is no evidence in the record to suggest that Moses' statement is anything more than "mere conjecture." *See Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 241 (D.N.J. 2015) (holding that no reasonable jury could conclude the plaintiff was terminated based on her race, noting that "although Plaintiff and [another individual] both opined that Plaintiff received more difficult assignments because she was Black . . . there are no facts in the record to suggest that this was more than mere conjecture"). Another employee's "personal belief that Plaintiff was discriminated against" is not sufficient to show pretext where "it is an unsupported opinion which makes no causal link to Plaintiff's termination." *Id*.

---

[4] Without deciding whether this statement constitutes hearsay, the Court notes that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009); *see also* Fed. R. Civ. P. 56(c)(2) (stating that, on a motion for summary judgment, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

In light of the two decades that Plaintiff was employed by PNC, his frustration at being terminated reportedly due to a single year of poor performance is palpable. The fact remains, however, that Plaintiff has not presented any evidence that would allow a reasonable jury to conclude that his termination was based on his race, rather than on his performance. Summary judgment is thus warranted on Plaintiff's race-based termination claim, as well as his age-based termination claim.

### B.     Failure to Promote Claims

To establish a prima facie case of discrimination for a failure-to-promote claim under the NJLAD, a plaintiff "must show that (i) [he] belongs to a protected class; (ii) [he] applied for and was qualified for a particular position; (iii) [he] was rejected for the position; and (iv) after the rejection, the position remained open and Defendant continued to seek applications from persons with Plaintiff's qualifications." *Cubbage v. Bloomberg, L.P.*, Civ. No. 05-2989, 2010 WL 3488619, at *14 (E.D. Pa. Aug. 31, 2010) (citing *Allen v. Nat'l R.R. Passenger Corp.*, Civ. No. 07–3781, 2005 WL 2179009, at *6 (E.D. Pa. Sept.6, 2005)).

While Plaintiff alleges that he applied for and was denied many promotions throughout his 22 years at PNC, and alleges that these denials were based on his age and/or race, he admits that he did not apply for any promotions after August 10, 2016. (Doc. 22-14 at 36.) Noting the NJLAD's two-year statute of limitations, Defendants argue that summary judgment is therefore warranted, as Plaintiff brought his failure to promote claim more than two years after he was denied any promotion. (Def. Br. at 40–41.) Plaintiff does not make any argument in response, leading the Court to believe he has abandoned his failure to promote claims; however, the Court addresses the substance of Defendants' argument nonetheless.

"[T]he statute of limitations on a NJLAD claim is two years, subject to the exception of the continuing violations doctrine," which allows a "'plaintiff to pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period.'" *Smith v. Twp. Of E. Greenwich*, 519 F. Supp. 2d 493, 505 (D.N.J. 2007), *aff'd*, 344 F. App'x 740 (3d Cir. 2009), *as amended* (Nov. 3, 2009) (quoting *Shepherd v. Hunterdon Developmental Ctr.*, 803 A.2d 611 (N.J. 2002). Because an "employer's failure to promote is quintessentially a discrete employment action," the continuing violations doctrine does not save such claims from being barred by the NJLAD statute of limitations. *Id*. at 505–506 (citing *AMTRAK v. Morgan*, 536 U.S. 101, 115 (U.S. 2002).

Here, Plaintiff states generally that he applied for many promotions throughout his career, but admits that he did not apply for any promotion within two years of filing this lawsuit. (Doc. 22-14 at 36.) Because no failure to promote occurred within the applicable statute of limitations, summary judgment is warranted for Defendants on Plaintiff's failure to promote claims. *Smith*, 519 F. Supp. 2d at 506.

### C. Disparate Treatment Claims

"In order to establish a prima facie case for allegations of disparate treatment, a plaintiff must establish that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment action." *Rogers v. Alternative Res. Corp.*, 440 F. Supp. 2d 366, 371 (D.N.J. 2006) (citing *El–Sioufi v. St. Peter's Univ. Hosp.*, 887 A.2d 1170 (N.J. Super. Ct. App. Div. 2005).

Plaintiff's Complaint appears to allege a disparate treatment claim based on his belief, as discussed above, that he was given lower quality leads than other Commercial Banking RMs due to his age and/or race. Defendants request a grant of summary judgment on Plaintiff's disparate treatment claims, again arguing that leads were randomly assigned to RMs, and that Plaintiff failed to scrub the bad leads from his list.[5] (Def. Mot. at 41–43.)

As the Court found above, the record is clear that Plaintiff declined to scrub poor quality leads from his list. Other than Plaintiff's own conclusions and suspicions, the record contains no evidence to show that the leads were distributed in any way based on race or age. Accordingly, for the same reasons discussed in the wrongful termination section above, summary judgment is warranted for Defendants on Plaintiff's disparate treatment claims. *Parker*, 2020 WL 4530107, at *3 (affirming a grant of summary judgment where the plaintiff's attempt to show pretext relied on her "vague, unsupported assumptions" rather than on evidence from the record).

## IV.   CONCLUSION

For the reasons expressed above, Defendant's Motion for Summary Judgment (Doc. 22) is GRANTED. An accompanying Order shall issue.

Dated:   8/21/2020                                                        /s Robert B. Kugler
                                                                                    ROBERT B. KUGLER
                                                                                    United States District Judge

---

[5] As with the failure to promote claims, Plaintiff again fails entirely to respond to Defendants' arguments for summary judgment on the disparate treatment claims, and the Court thus assumes that he is abandoning them. However, for the sake of completeness, the Court nonetheless addresses the substance of Defendants' arguments.